UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KODY SEILER,                              )
                                          )
          Plaintiff,                      )
                                          )
     vs.                                  )          Case No. 1:16-CV-77 (CEJ)
                                          )
NANCY A. BERRYHILL[1],                    )
Acting Commissioner of Social Security,   )
                                          )
          Defendant.                      )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration (SSA). The Court has reviewed the parties' briefs and the entire administrative record.

## I.  Procedural History

On May 14, 2013, plaintiff filed an application for adult disabled child's insurance benefits under Title II of the Social Security Act, alleging disability beginning December 1, 1995. (Tr. 151-159). The claim was denied initially on August 30, 2013. (Tr. 83). Thereafter, plaintiff filed a written request for hearing on October 2, 2013. (Tr. 90-91). On August 13, 2014, a video hearing was held in front of an Administrative Law Judge (ALJ). (Tr. 41-65). The ALJ subsequently issued an unfavorable decision on December 19, 2014. (Tr. 9-25). On February 11, 2016, the Appeals Council declined to review the ALJ's decision. (Tr. 1).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

Accordingly, the ALJ's decision stands as the Social Security Commissioner's final decision.

## II.    Evidence Before the ALJ

### A. Disability Application Documents

On May 14, 2013, plaintiff applied for adult disabled child's insurance benefits under Title II of the Social Security Act. (Tr. 151, 153). Plaintiff's claim for disability benefits was based upon: severe hearing loss, choanal artresia in nose, chronic ear infections, and depression. (Tr. 66). Plaintiff alleged an inability to function and/or work as of December 1, 1995, when he was one year old. (Tr. 66).

### 1.    Disability Report (undated)

In an undated Disability Report plaintiff stated that he suffered from severe hearing loss, choanal artresia in nose, chronic ear infections, and depression. (Tr. 176). Plaintiff reported that he had never worked and believed his condition had become severe enough to keep him from working on December 1, 1995. (Tr. 176). Plaintiff graduated from high school on May 17, 2013 and did not attend special education classes or complete any type of specialized job training, trade, or vocational school. (Tr. 177). From August 2011 to April 2013, and continuing as needed, plaintiff saw Deanna Siemer, M.D., as his general physician. (Tr. 183). Dr. Siemer treated, among other issues, plaintiff's ear infections. (Tr. 183).

Plaintiff stated that he had seen Steve Brown, a health care professional at The Audiology Center, from 1995 or 1996 until 2011 for checkups, to clean out his ears, do audio tests, and secure hearing aids. (Tr. 179). Plaintiff also noted that he had a hearing test performed in 2011 by Christopher H. Jung, M.D. (Tr. 179-180). Plaintiff stated he also saw Dr. Jung in 2013 for an ear examination and to receive x-rays for his ears. (Tr. 180). Plaintiff also noted that he had seen Richard

Martin, M.D. since 1995 or 1996 until 2007 to place tubes in his ears, to remove his adenoids/tonsils, and for surgery on his nose. (Tr. 181). Plaintiff also stated that he visited Miracle Ear every three months from August of 2011 to April of 2013 for checkups, cleaning, hearing aids, and audio testing. (Tr. 181-182). Plaintiff noted that he saw Jan Seabaugh, M.D. from 2007 until 2012 for checkups, in-ear tube placement, and to receive antibiotics for ear infections. (Tr. 182). Plaintiff also visited Vocational Rehabilitation at the end of 2012 to meet with Melissa Gallup, a counselor for the deaf assisting in education and training. (Tr. 184).

## 2.    Disability Report – Field Office

In a Disability Report dated May 14, 2013, plaintiff alleged a disability onset date of December 1, 1995, and stated that was the date he began wearing hearing aids. (Tr. 186). The report stated that plaintiff had difficulty with hearing, understanding, coherency, concentrating, talking, and answering. (Tr. 187). The report observed that plaintiff was neat and clean, and cooperative most of the time. (Tr. 188). The report noted that plaintiff had difficulty hearing the questions he was being asked, and most of the questions were answered by his grandmother. He also appeared to have difficulty understanding the questions, as he would look to his grandmother for the information. (Tr. 188). The report further noted that plaintiff insisted on reading everything himself and stated that he read well. (Tr. 188). The field officer noted that he thought plaintiff may have been in special education; however both plaintiff and his grandmother said he had not been in special education classes. (Tr. 188). Plaintiff and his grandmother reported that plaintiff loved school and did not want to graduate and lose contact with his friends.

(Tr. 188). The field officer wrote that plaintiff appeared and sounded a lot younger than his years and seemed very immature. (Tr. 188).

### 3. Function Report

In a Function Report dated May 28, 2013, plaintiff stated he lived at home with his grandparents. (Tr. 189). When asked what he did from the time he woke up until going to bed, plaintiff stated that he played video games, visited neighbors, went to town, attended school until graduation, and went for daily walks. (Tr. 189). Plaintiff also stated that he was not working at the time. (Tr. 197). Plaintiff stated that he does not support anyone else nor does he take care of pets or other animals for himself or others. (Tr. 190). Plaintiff also stated that illnesses, injuries, or other conditions do not impact his sleep. (Tr. 190).

Plaintiff noted that he had no problems with personal care. (Tr. 190). He did not need special reminders to take care of personal needs and grooming, nor did he need help or reminders to take medicine. (Tr. 191). Plaintiff stated that his grandmother prepared his meals, but sometimes he cooks food in the microwave. (Tr. 191). Plaintiff's household chores consisted of weeding the yard once a month. (Tr. 191). He did not do housework because he lives with his grandparents and just graduated high school. (Tr. 192). Plaintiff's primary hobbies and interests are reading, video games, and using his computer to write; he engaged in these activities daily. (Tr. 193). Plaintiff also spent time with others playing sports and riding all-terrain vehicles on a weekly basis. (Tr. 193). He attends sporting events and does not need anyone to accompany him. (Tr. 193). Plaintiff also stated that he does not have problems getting along with family, friends, neighbors, or others. (Tr. 194).

Plaintiff stated that he does a lot of walking and can walk two miles or more without a rest. (Tr. 192). He stated that he is able to go out alone and that he walks, drives a car, or rides in a car to get to his destination. (Tr. 192, 194). Plaintiff is able to do shopping in stores and by computer. (Tr. 192). Plaintiff stated that he is able to pay bills, count change, and use a checkbook/money order and that his ability to handle money had not changed since his condition began. (Tr. 192-193).

Plaintiff stated that his condition affects his talking and hearing because his loss of hearing makes it harder to communicate. (Tr. 194). Plaintiff stated he can follow written instructions well but has trouble following spoken instructions because of his hearing issues. (Tr. 194). Plaintiff stated that he gets along with authority figures and can handle stress and changes in routine. (Tr. 195). Plaintiff wears a hearing aid and uses contact lenses, both prescribed by doctors. (Tr. 195). The hearing aid was prescribed when he was 18 months old and the lenses were prescribed when he was in second grade. Plaintiff stated he needs these aids at all times. (Tr. 195).

### 4.   **Disability Determination Explanation**

According to the Disability Determination Explanation, dated August 30, 2013, plaintiff had hearing loss which was not treated with cochlear implantation and plaintiff's statements about the intensity, persistence, and functionally limited effects of the symptoms were substantiated by the objective medical evidence. (Tr. 70-71). It was further noted that plaintiff's treating physician stated that plaintiff would be unable to excel or function in the world without his hearing aids; however, with his aids he should be able to complete tasks as he would want. (Tr. 72). The

explanation found that plaintiff was not limited to unskilled work because of the impairments and determined he was not disabled.  (Tr. 73).

The case analysis noted that plaintiff was not currently being treated by a psychiatrist and was not seeking outpatient counseling.  (Tr. 70).  He was also not taking any psychotropic medications at the time and had not required inpatient or emergency treatment for any mental impairment.  (Tr. 70).  Plaintiff denied problems with personal care and noted he does some yard work and is able to drive and go out alone.  (Tr. 70).  He further stated that he shops in stores and by computer and spends time with others playing video games, sports and riding his all-terrain vehicle.  (Tr. 70).  He further reported that he handles stress and changes in routine adequately.  (Tr. 70).

### 5.     Work History Report

An undated work history report was contained in the record.  Apart from listing plaintiff's name, social security number, and phone numbers the report was left blank.  (Tr. 169-175).

### B. Medical Records

### 1.     The Audiology Center

On May 29, 1998, plaintiff visited the Audiology Center for testing by Steve Brown.  (Tr. 256).  Plaintiff was not tested for speech discrimination.  (Tr. 256).  Brown recommended a follow-up visit.  (Tr. 256).  After testing on February 2, 2000, it was noted that plaintiff had speech discrimination of 92% in the right ear and 88% in the left ear.  (Tr. 255).  Brown remarked that plaintiff had moderate to severe loss in his ears.  (Tr. 255).  On November 26, 2011, plaintiff underwent testing which revealed that plaintiff had speech discrimination of 80% in the right ear and 92% in the left ear.  (Tr. 253).  On February 11, 2002, plaintiff was tested

and was found to have speech discrimination of 88% in the right ear and 92% in the left ear. (Tr. 251). Brown stated that there was significant improvement in the right ear. (Tr. 251). On October 24, 2002, plaintiff underwent testing which revealed that he had good speech discrimination in both ears with discrimination scores of 92% for both ears. (Tr. 247).

On August 15, 2005, plaintiff visited the Audiology Center for testing. (Tr. 246). Brown commented that results continue to suggest sensorineural hearing loss, mild to moderate in the left ear and moderate in the right. (Tr. 246). Brown recommended daily use of hearing aids, preferential classroom seating, and use of personal FM auditory trainer in classroom as needed. (Tr. 246). On August 7, 2006, plaintiff visited the Audiology Center for testing which noted that plaintiff had good speech discrimination in both ears with discrimination scores of 92% for both ears. (Tr. 242). Brown noted that there was a significant conductive reduction in hearing, in addition to sensori-neural loss. (Tr. 242).

On May 31, 2007, plaintiff visited the Audiology Center for testing which noted that plaintiff had good speech discrimination in both ears with discrimination scores of 92% for both ears. (Tr. 241). Brown noted that there was a significant conductive reduction in hearing, in addition to sensori-neural loss. (Tr. 241). On May 19, 2008, plaintiff visited the Audiology Center for testing which noted that plaintiff had good speech discrimination in both ears with discrimination scores of 92% for both ears. (Tr. 239). On September 13, 2010, Brown observed moderate sensori-neural hearing loss in both ears. (Tr. 236). Brown recommended: (1) daily use of hearing aids, (2) preferential classroom seating, and (3) use of FM-loop systems for direct auditory input. (Tr. 236).

On September 16, 2010, Brown wrote a letter to Laura Saupe, RN, a nurse at plaintiff's high school. (Tr. 237). Brown wrote that plaintiff experiences a sensori-neural impairment of hearing in each ear and had worn amplification in each ear since childhood. (Tr. 237). Brown also noted that plaintiff's hearing aids were approximately seven years old, and that one of them was no longer working and the other did not meet the manufacturer's specifications. (Tr. 237). Brown also stated that plaintiff's hearing loss is of moderate severity and slightly worse on his right side. (Tr. 237). He noted plaintiff maintained relatively good speech discrimination and normal middle ear function bilaterally. (Tr. 237). Brown recommended plaintiff be fit with new and more appropriate amplification and that he be provided with preferential classroom seating and an FM amplification system on an as needed basis. (Tr. 237).

On October 18, 2010, Steve Brown authored a letter to plaintiff's parents regarding plaintiff's September 13, 2010 visit. (Tr. 238). The letter stated that plaintiff continued to experience a moderate sensori-neural hearing loss in both ears, slightly worse on the right side. (Tr. 238). Brown noted the age of plaintiff's hearing aids and that one did not work and the other did not meet the manufacturer's specifications. (Tr. 238). The letter also noted that plaintiff did not qualify for Medicaid and that new devices would be ordered upon receipt of notification that financing had been obtained. (Tr. 238).

On April 1, 2011, plaintiff visited the Audiology Center for testing by Cathy Willen. (Tr. 234). Willen noted that there was a significant change in hearing from September 13, 2010. (Tr. 234). Willen suggested plaintiff increase volume in his hearing aids and recommended plaintiff for a follow-up visit. (Tr. 234).

### 2.    Jan Seabaugh

On February 17, 2012, plaintiff visited Jan Seabaugh, M.D. with drainage in his left ear.  (Tr. 259).  Dr. Seabaugh noted that plaintiff's primary complaint was a possible ear infection and left ear trouble.  (Tr. 259).  Dr. Seabuagh performed an exam on his ears, prescribed medicine and recommended plaintiff return in two weeks for follow-up.  (Tr. 260).

### 3.    Christopher Jung

On February 5, 2013, plaintiff saw Christopher Jung, M.D., for recurrent ear infections.  (Tr. 262).  Plaintiff also complained of hearing loss.  (Tr. 262).  Jung diagnosed plaintiff with unspecific otitis media, chronic sinusitis, and a deviated nasal septum.  (Tr. 264).  On June 3, 2013, plaintiff visited Dr. Jung presenting with bilateral bloody ear drainage.  (Tr. 281).  Jung noted plaintiff had unresolved symptoms including: hearing loss, bilateral ear discharge, bilateral earache, and recurring ear infections.  (Tr. 281). Jung diagnosed plaintiff with suppurative and acute otitis media without spontaneous rupture of ear drum and dysfunction of theEustachian tube.  (Tr. 283).

On April 1, 2014, plaintiff presented to Dr. Jung complaining of issues with his hearing aids which caused him to get infections.  (Tr. 310).  Plaintiff reported hearing loss, bilateral ear discharge, bilateral earache, and recurring ear infections. (Tr. 310).  On May 5, 2014, plaintiff visited Dr. Jung for a checkup on his ear infection.   (Tr. 307).   Plaintiff noted that he had finished his antibiotics, and complained that his hearing aids were contributing to his ear infections.  (Tr. 307). Jung diagnosed plaintiff with unspecified otitis media, unilateral sensory neural hearing loss, and unilateral mixed hearing loss.  (Tr. 307).  On June 2, 2014,

plaintiff visited Dr. Jung complaining of an infection in his left ear. (Tr. 303). Plaintiff reported hearing loss, bilateral ear discharge, bilateral earache, and recurring ear infections. (Tr. 303). Jung diagnosed plaintiff with unilateral sensory neural hearing loss, unilateral mixed hearing loss, an allergy due to allergen rhinitis and general otorrhea. (Tr. 305). On July 28, 2014, plaintiff presented to Dr. Jung for a follow-up visit regarding bilateral ears and sinus symptoms. (Tr. 313). Dr. Jung diagnosed plaintiff with nasal airway obstruction congestion, bilateral mixed hearing loss, acute otitis external, unspecified otorrhea, allergy due to allergen rhinitis, maxillary chronic sinusitis, and dysfunction of the Eustachian tube. (Tr. 315-16).

### 4. Jackson Primary Care

On August 6, 2012, plaintiff visited Jackson Primary Care presenting with an earache that had been present for days. (Tr. 276). Plaintiff presented symptoms of pain and drainage. (Tr. 276). On August 8, 2012, plaintiff saw Dr. Deanna Siemer for a routine examination. (Tr. 274). Dr. Siemer suggested follow-up in one week to remove plaintiff's moles. (Tr. 274). On September 9, 2012, plaintiff visited Dr. Siemer for an earache and mole removal. (Tr. 272). On September 17, 2012, plaintiff visited Dr. Siemer to remove sutures. (Tr. 270). Dr. Siemer noted that plaintiff was healing well. (Tr. 270).

### 5. Melissa Gallup

On May 1, 2013, plaintiff met with Melissa Gallup who administered an interest inventory of Missouri connections and a career scope exam. (Tr. 219). During the meeting, Gallup noted that plaintiff made very poor eye contact, spoke very softly, and responded with one-word answers. (Tr. 219). Gallup noted that

plaintiff scored well in clerical perception and was interested in arts, photography, and film. (Tr. 219). Gallup suggested graphic arts as a potential vocation for plaintiff. (Tr. 219). Gallup noted that plaintiff's grades had fluctuated, noting he was making C's in English and history and had an A in algebra. (Tr. 219). Gallup also noted that plaintiff had never had any accommodations in school. (Tr. 219). Gallup also stated that because of the lack of accommodations throughout his school career, social awkwardness, and extreme shyness, it was difficult to assess his academic and learning ability. (Tr. 219).

On July 15, 2013, Gallup stated that she attempted to discuss plaintiff's interests and plans; however plaintiff was almost silent throughout the conversation. (Tr. 218). Plaintiff's grandmother attended the meeting and would answer after trying to get plaintiff to respond. (Tr. 218). Gallup presented the career scope results and noted plaintiff scored highest in art interests and then social interests. (Tr. 218). Gallup stated that the social result did not fit plaintiff and made her question whether he understood the questions. (Tr. 218). On October 28, 2013, plaintiff again met with Gallup. (Tr. 217). Gallup attempted to discuss plaintiff's interests and plan for the future but noted that it was extremely difficult to get information from him. (Tr. 217). She also stated that he really wanted to attend school next semester but would have to get student loans to pay unless he was awarded Supplemental Security Income. (Tr. 217).

In a phone call on February 4, 2014, Gallup and plaintiff's grandmother discussed the denial of plaintiff's disability claim and the fact that plaintiff was still not working. (Tr. 216). It was noted that plaintiff's social skills were very poor and he did not talk or respond to questions. (Tr. 216). Gallup reported that plaintiff

wanted to go to school but did not have money to pay for it.  (Tr. 216).  Gallup also noted that while plaintiff can drive, he did not like to drive to Perryville which would be the best location to find an entry level job.  (Tr. 216).

Following a meeting with plaintiff on May 5, 2014, Gallup noted that plaintiff had been doing some farmhand work part-time.  (Tr. 215).  They discussed the option of looking for work in a different location because there were few job opportunities where plaintiff lived.  (Tr. 215).  They discussed volunteering to help build his resume and references, but plaintiff stated he did not want to do that.  (Tr. 215).  Gallup noted that plaintiff was not pursuing college for next semester.  (Tr. 215).  Gallup further noted that plaintiff's social skills were his biggest impediment to employment, coupled with his hearing loss, and intensified by his inability to communicate and interact appropriately with others.  (Tr. 215).

### 6.      Tender Hearts Child Therapy Center

On October 8, 2013, plaintiff received a treatment plan from Tender Hearts Child Therapy Center after a psychological assessment administered by Brittany Meredith.  (Tr. 289).  Plaintiff's grandmother brought him for therapy due to abuse suffered while plaintiff was living with his mother and step-father and to deal with the death of his father from cancer.  (Tr. 294).  The primary problem identified in the plan was that plaintiff was the victim of physical and emotional abuse.  (Tr. 289).  The plan's stated goals were to reduce displays of aggression that reflect abuse and keep others at an emotional distance, resolve feelings of fear and depression while improving communication, and build self-esteem and a sense of empowerment.  (Tr. 289).

### 7.      Miracle Ear

On June 12, 2014, Elizabeth Eschmann filled out a hearing loss questionnaire and noted that hearing aids substantially improved plaintiff's hearing loss. (Tr. 298). Eschmann also stated that plaintiff's word recognition score without hearing aids was at 84% on both right and left ears. (Tr. 298). She noted that plaintiff was unable to hear and understand normal sound level conversation, however she also stated that plaintiff was able to hear and understand phone conversations. (Tr. 298). Eschmann also noted that with his hearing aids in, plaintiff should be able to complete tasks when instructed by coworkers and supervisors with his hearing aids; however without his hearing aids plaintiff would struggle. (Tr. 298). Eschmann also stated that plaintiff could read lips successfully. (Tr. 298).

### C. Testimony at Hearing

#### 1. Plaintiff's Testimony

At the hearing on August 13, 2014, plaintiff testified in response to questions posed by the ALJ and counsel. (Tr. 43). Plaintiff stated that he moved in with his grandparents three years prior to the hearing, following the death of his father. (Tr. 51). Plaintiff stated that he was twenty years old and that his grandmother handled his medical insurance. (Tr. 43-44). Plaintiff stated that he currently had medical issues, specifically ear infections with some drainage and some issues with pain in his ears. (Tr. 56). Plaintiff testified that he had used his hearing aids since he was a baby. (Tr. 55). Plaintiff noted that typically his hearing in his left ear is worse than his right ear. (Tr. 56). Plaintiff stated that he typically has infections regularly over the course of several weeks and receives antibiotics from his doctors. (Tr. 56). Plaintiff noted that his grandmother had him visit the doctor every month regarding his ears. (Tr. 56). Plaintiff stated that he used to see Dr. Steve Brown

regarding his ears but changed doctors a few years ago. (Tr. 56). Plaintiff also noted that it hurt to use his hearing aids when he has an ear infection. (Tr. 57). However, plaintiff noted that he does not feel like his ear pain or ear condition affected his ability to concentrate on his schoolwork and that he could still complete his work. (Tr. 58). He denied feeling any type of depression or sadness and stated that he spoke with a counselor regarding his hearing. (Tr. 58).

Plaintiff testified that he had graduated from high school. (Tr. 48). He noted that he was disappointed that high school was over and he felt like he was leaving everybody behind. (Tr. 48). Plaintiff testified that he spends time with younger people and but also has friends his own age. (Tr. 53). Plaintiff further testified that he doesn't spend time with people his own age anymore because they went different places after high school. (Tr. 53). Plaintiff stated his closest friend is his fifteen-year-old next door neighbor, they see each other almost daily and typically play Xbox or throw a baseball around. (Tr. 53). Plaintiff stated that his hearing gave him trouble at school because at times he couldn't understand what was being said – he noted that he was often put close to the front of the classroom which allowed him to better understand. (Tr. 48). Plaintiff further testified that he did not usually need to ask his teachers for help explaining concepts. (Tr. 48). Plaintiff stated that he does not have trouble reading; he reads chapter books and used to read all the time. (Tr. 48).

Plaintiff testified that he is able to do household chores, such as cooking, cleaning, and dusting. (Tr. 51). Plaintiff also noted that he sometimes needs reminders to do chores, and occasionally gets frustrated or angry when someone reminds him. (Tr. 51-52). Plaintiff stated that his only previous work experience

was doing small jobs for his neighbors.  (Tr. 54).  Plaintiff stated that he would feed their animals and water their plants.  (Tr. 54).  Typically, plaintiff would work for the neighbors when they went on vacation.  (Tr. 55).  Plaintiff also has a driver's license.  (Tr. 49).  He passed both a written exam administered on a computer and a driving exam.  (Tr. 49).  Plaintiff stated that he does not have trouble driving, but does not drive often.   (Tr. 50).   Plaintiff noted that if he is not driving his grandmother takes him to his appointments.  (Tr. 50).

On a typical day, plaintiff testified that he writes stories and reads.  (Tr. 54). Plaintiff noted that he does not have trouble concentrating while writing stories. (Tr. 59).  Plaintiff stated that he occasionally watches television and has to have it set at a certain volume or cup his ears in order to hear.  (Tr. 54).  Plaintiff stated that he was unaware if he was receiving any income, but stated that he managed his own money.  (Tr. 47).  He noted that he was unsure how much money he had and stated that he sometimes used his money to pay for his phone and he expected he would need to pay for insurance soon.   (Tr. 47).   Plaintiff stated that he sometimes purchases books and games, and was trying to limit his consumption of candy and food.  (Tr. 47).

Plaintiff stated that he had trouble falling asleep at times.  (Tr. 54).  He also noted that he sometimes stayed up or woke up late.  (Tr. 54).  Plaintiff wasn't sure why he had trouble falling asleep but sometimes he felt that he just wasn't ready to go to sleep.  (Tr. 54). Plaintiff also testified about visiting a Tender Hearts counselor and discussing his anger and frustration when his grandmother repeats things.  (Tr. 52).   Plaintiff also stated that he did not get frustrated at school if he didn't understand a concept or if he had any trouble.  (Tr. 53).

## 2.     **Vocational Expert Testimony**

During the hearing, the Administrative Law Judge proposed a number of hypothetical questions to Dr. Geist, the vocational expert.  (Tr. 61).  Each hypothetical assumed an individual the same age as plaintiff, with a high school level education and no past relevant work experience.  (Tr. 61). The first hypothetical assumed the individual has no exertional limitations, but noted the individual should avoid working around hazards, such as unprotected heights, around dangerous or moving machinery, and should not be subject to a noise level above moderate.  (Tr. 61).   The individual is further limited to hearing and understanding simple oral instructions and communicating simple information and should not be required to talk on the telephone as part of the job function.  (Tr. 61).   Dr. Geist suggested such a person could do janitorial work, packing, or inspections.  (Tr. 62).  The second hypothetical assumed the same limitations, with the added limitation that the individual is unable to perform tasks requiring more than superficial interaction with the public or coworkers.  (Tr. 62).  Dr. Geist stated the additional limitation would not eliminate any of her previously suggested jobs. (Tr. 63).

Plaintiff's counsel assumed the same limitations, with the added limitation of being unable to hear and understand normal sound level conversations.  (Tr. 63). Dr. Geist stated that if the individual was unable to understand directions from the supervisor on the occasional basis they are given, the proposed jobs would be eliminated.  (Tr. 63).  Plaintiff's counsel also asked, assuming the limitations posed in the first hypothetical, whether an individual who consistently missed two days of work per month due to mental or physical symptoms would be able to perform the

listed jobs.  (Tr. 64).   Dr. Geist stated those limitations would likely not be tolerated.  (Tr. 64).  Plaintiff's counsel also asked, assuming the limitations posed in the first hypothetical, whether an individual requiring the use of a job coach to re-explain or help the individual understand even simple instructions would be able to perform the listed jobs.   (Tr. 64).   Dr. Geist stated that likely would not be acceptable.  (Tr. 64).

### D. **Psychological Report**

Plaintiff was evaluated on September 23, 2014, by Shawn Guiling, a licensed psychologist, after being referred by the ALJ for a psychological examination.  (Tr. 319).  The report noted that plaintiff's allegations were severe hearing loss, in nose choanal atresia, chronic ear infections, and depression.  (Tr. 319).  Plaintiff noted that he currently was suffering from an ear infection.  (Tr. 320).  Guiling stated that plaintiff was cooperative and somewhat forthcoming with information as part of the examination, but noted that a good number of plaintiff's answers were noncommittal and that plaintiff would have to be asked for clarification regularly. (Tr. 319).   Guiling stated he used records obtained and sent by the ALJ, the interview with plaintiff, plaintiff's grandmother, and a number of letters from acquaintances of plaintiff.  (Tr. 319-20).

Plaintiff's grandmother stated that her desire was for plaintiff to get a job or learn a useful skill; if he was unable to do that she hoped he would get support through disability determinations.  (Tr. 320).  Plaintiff had no explanation of his concerns except that he wanted his grandmother to stop pressuring him to get a job and his grandfather to stop being cranky with him.  (Tr. 320).  Plaintiff stated that he had no job and did not know of any job he would like to do beyond being a

film director.  (Tr. 321).  Plaintiff further stated that he reads a lot and had started writing about a character based on episodes of television he had watched.  (Tr. 321).  Plaintiff stated that he took care of his neighbors' pets and plants while they were away and had applied to work at various places near his home, including a gas station, diner and career center as janitorial staff; however plaintiff stated that none of these locations were hiring.  (Tr. 321).  Plaintiff also stated that he considered working at Wal-Mart but was concerned about the drive.  (Tr. 321).

Dr. Guiling noted that plaintiff demonstrated somewhat below average intelligence and fund of knowledge.  (Tr. 322).  Dr. Guiling noted that plaintiff was able to identify the current day of the week, the month, year, and season; however, it took plaintiff several attempts to determine the right answers, having to talk aloud to himself and recite the months and days of the week.  (Tr. 321).  Plaintiff was also only able to count backward from 100 by 7s twice, counting 93 and 86, before being unable to continue.  (Tr. 321).  During the interview, plaintiff demonstrated poor judgment and minimal insight, showing little understanding of his concerns and minimal preparation for his day to day life and future.  (Tr. 322).  Plaintiff stated that he was mature enough to handle money, however Dr. Guiling noted that there was no evidence of his ability because he had never held a job.  (Tr. 322).  Dr. Guiling stated that plaintiff was likely unable to understand and remember more than very simple instructions, especially without repetition.  (Tr. 322).  Dr. Guiling further observed that plaintiff appeared to have difficulty concentrating and reported no ability to persist in tasks.  (Tr. 322).

Dr. Guiling's diagnostic impression of plaintiff was an unspecified neurodevelopmental disorder.  (Tr. 322).  Dr. Guiling remarked that plaintiff had

generally low intellectual ability and adaptive functioning.  (Tr. 323).  Dr. Guiling observed that plaintiff currently functioned similarly to a person with developmental and intellectual delays, and believed those skills had been delayed by verbal abuse and others in his life doing tasks for him instead of expecting him or aiding him to learn new skills.  (Tr. 323).  Dr. Guiling further observed that plaintiff was largely unaware of his day-to-day difficulties with societal expectations and was likely not able to fully cognitively comprehend them.  (Tr. 323).  Dr. Guiling noted that plaintiff does have support in the form of his grandmother, but suggested plaintiff would possibly progress faster if he was not where someone would always clean up after him, instead requiring him to do more on his own.  (Tr. 323).  Dr. Guiling suggested plaintiff would benefit from a sleep study, career counseling, and job shadowing to help find a suitable job or sheltered workshop type option for work where tasks would entail close supervision and repetition of direction.  (Tr. 323).

### E. **Third-Party Statements**

Plaintiff provided the ALJ with statements from family members, neighbors, and employees from the Oak Ridge School District.

### 1.     **Edward McGrew**

On July 17, 2014, Edward McGrew, the Oak Ridge School District school psychological examiner, provided a statement in support of plaintiff's application for disability benefits. (Tr. 224).  McGrew stated that in his opinion, plaintiff would have difficulty living and working independently.  (Tr. 224).  McGrew based this opinion on his observation that plaintiff operates on a very immature level socially and plaintiff's profound hearing loss.  (Tr. 224).  McGrew noted that plaintiff, as a high school senior, described his best friends as students in middle school because

he was better able to relate to much younger students while having no successful relationships among his peers. (Tr. 224). McGrew further noted that plaintiff had difficulty communicating with staff. (Tr. 224). McGrew also stated that plaintiff often did not wear his hearing aids, stating that they did not work properly. (Tr. 224). McGrew further stated that when plaintiff has hearing aids that operate properly, he still suffers from frequent ear infections. (Tr. 224).

### 2. Kim Keller

In a letter dated June 27, 2014, Kim Keller, an employee of the Oak Ridge School District, described plaintiff as sweet, polite, and eager to help. (Tr. 222). She noted that plaintiff was fairly quiet, but he occasionally expressed a desire for more friends. Although plaintiff was never one of Keller's students, she worked with him on different occasions through the school's after-school program.

Keller stated that plaintiff's hearing loss limited his ability to communicate effectively. She further noted that it is often necessary to repeat things to him multiple times and that his hear impairment results in miscommunications. (Tr. 222). Keller also noted that plaintiff's hearing loss has a negative impact on his speech, and that when conversing with plaintiff, one has to listen very carefully and intently to fully understand what he is saying. (Tr. 223). Keller stated that his hearing loss made communication with peers challenging and his physical impairments seemed to carry over and impact his ability to socialize effectively. (Tr. 223).

Keller stated that she believed plaintiff possesses average, and in some areas above average intelligence. (Tr. 223). Keller also stated that plaintiff's ability to independently function in society and the workforce is limited because of his poor

communication and socialization skills.  (Tr. 223).  While noting she is not a doctor or psychologist, Keller stated that it is imperative that plaintiff receive help soon and fears that if he doesn't experience accomplishment and pride in his work, plaintiff will continue to lose self-confidence and slip further into depression.  (Tr. 223).

### 3. Coraleta M. Alley-Pratt

Coralata M. Alley-Pratt is the neighbor of plaintiff's grandparents and her son is plaintiff's friend.  (Tr. 228).  In a letter dated August 1, 2014, Pratt wrote that plaintiff's ability to communicate is very low because of his hearing impairment. When Pratt and her family are out of town, plaintiff takes care of their animals for periods ranging from two to ten days.  Plaintiff's responsibilities have included feeding and watering the cats, taking care of the chickens, and taking care of the dog.  She noted that communicating with plaintiff over the phone is difficult because his speaking skills are weak.  She also noted that plaintiff cannot handle complex tasks even when the instructions are in writing, and that he seems to lack common sense.  Pratt further stated that plaintiff is socially behind other young men his age and has low communication skills.   She also stated that he does not seem aware of basic day to day issues.

### 4. Mark Gihring

In a letter dated August 1, 2014, Mark Gihring, one of plaintiff's teacher, wrote that plaintiff's disabilities are centered on his hearing impairment.  (Tr. 227). Gihring noted that plaintiff had a fair degree of difficulty communicating, both in hearing and speech, specifically in expressing himself effectively.  Gihring further noted that plaintiff's hearing impairment creates adversity in how he interacts with

others and how he could effectively accomplish tasks in an environment outside of family and friends. Gihring felt that plaintiff's ability to recognize danger, understand directions in critical situations, and quickly think on his feet are also hindered.

### 5.    **Shelly Schamburg**

Shelly Schamburg, plaintiff's aunt, described plaintiff as immature for his age, noting that he relates better to people who are younger than he.  (Tr. 226). She wrote that plaintiff is not very sociable, that he does not know how to interact well with people, and that he usually does not display any emotion.  She noted that plaintiff loves writing and reading about things that are based in fantasy. Schamburg further noted that plaintiff becomes nervous if he doesn't have a routine and he is afraid to try new things because he doesn't want to fail.

### 6.    **Jeanne Seiler**

Jeanne Seiler, plaintiff's grandmother, wrote that plaintiff came to live with her in August of 2011, after his father passed away.  (Tr. 225).  Seiler noted that plaintiff has had hearing aids since he was 18 months old and had had numerous ear infections.  Seiler stated that plaintiff is "way behind in his maturity," and that he doesn't interact well with people his age. (Tr. 225).  She noted that even though plaintiff had his driver's license, he did not want to go anywhere and that driving in town overwhelmed him.  Seiler believed that plaintiff could not consistently get to his appointments by himself. She added that people have a hard time understanding plaintiff's speech.

## III.   **The ALJ's Decision**

In the decision issued on December 19, 2014, the ALJ made the following findings with respect to plaintiff's application for disability insurance benefits:

1.      Born on June 29, 1994, the claimant has not yet attained age 22.

2.      The claimant has not engaged in substantial gainful activity since June 28, 2012, the date he attained age 18.

3.      The claimant has the following severe impairments: bilateral hearing loss and unspecific neurodevelopmental disorder.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P. Appendix 1.

5.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels.  He must avoid any exposure to workplace hazards such as unprotected heights and dangerous moving machinery and is limited to a work environment that has no noise above the moderate level.  He is limited to hearing and understanding simple oral instructions and only on an occasional basis, is limited to communicating simple information, and is precluded from telephone work, solicitation, or sales.  He cannot perform tasks requiring more than superficial interaction with the public or co-workers and where interaction is only on an occasional basis.

6.      The claimant has no past relevant work.

7.      The claimant was born on June 29, 1994 and attained age 18 on June 28, 2012.  He was a "younger individual" on that date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 1995, through the date of the decision.

(Tr. 9-25).

## IV.    **Discussion**

### A.  **Legal Standard**

The Court must affirm the Commissioner's decision "if the decision is not

based on legal error and if there is substantial evidence in the record as a whole to

support the conclusion that the plaintiff was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "'Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a plaintiff must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three requires the plaintiff to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the plaintiff does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.* Prior to step four, the ALJ must assess the plaintiff's residual functional capacity ("RFC"), which is the

most a plaintiff can do despite his limitations. *Moore*, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] plaintiff's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a plaintiff's RFC, the ALJ must evaluate the plaintiff's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the plaintiff's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the plaintiff's work history; and (7) the absence of objective medical evidence to support the plaintiff's complaints." *Buckner*, at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a plaintiff's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record

which caused the ALJ to reject the plaintiff's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether a plaintiff can return to his past relevant work, by comparing the RFC with the physical and mental demands of a plaintiff's past work. 20 C.F.R. § 404.1520(f). The burden at step four remains with the plaintiff to prove her RFC and establish that he cannot return to his past relevant work. *Moore*, 572 F.3d at 523; accord *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four of the process that a plaintiff cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the plaintiff maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *see also* 20 C.F.R. § 404.1520(f). If the plaintiff is prevented by his impairment from doing any other work, the ALJ will find the plaintiff to be disabled.

**B. Dr. Guiling**

Plaintiff first argues that the ALJ erred by giving insufficient weight to Dr. Guiling's opinion.

In making a disability determination, the ALJ must "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record." 20 C.F.R. § 404.1527(b); *see also Heino v. Astrue,* 578 F.3d 873, 879 (8th Cir.2009). It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record. *Prosch v. Apfel,* 201 F.3d 1010, 1013–14 (8th Cir.2000).

According to 20 C.F.R. § 404.1527(c) an ALJ will consider several factors to decide the weight that should be afforded to a medical opinion, including the (1) examining relationship, (2) length of the treatment relationship and frequency of examination, (3) nature and extent of the treatment relationship, (4) supportability of the opinion, (5) consistency with the record as a whole, (6) specialization of the expert, and (7) any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c)(1)-(6). Here, the ALJ assigned no weight to Dr. Guiling's opinion of the need for close supervision and repetition of direction. The ALJ noted that Dr. Guiling examined plaintiff only once and that it did not appear that he reviewed the other evidence in the record. Dr. Guiling makes no reference to any material other than his own observations in his report with the exception of his notation that he used the records obtained from the ALJ as a source for his report. The ALJ noted that Dr. Guiling's report appeared inconsistent with plaintiff's statements in his application materials, to various treating sources, and at the hearing. The ALJ also remarked that the plaintiff had not demonstrated significant deficits in memory, concentration, or cognitive skills to other examiners, and he had not reported or alleged any limitations in those areas. The ALJ further noted while third-party statements indicated some limitation in those areas, the medical records and plaintiff's own recollections did not support those assertions.

Plaintiff argues that the ALJ's reasoning is not sufficient to discount Dr. Guiling's opinion and that it is unclear how review of the records in this case would have helped Dr. Guiling form an opinion regarding plaintiff's mental limitations. Plaintiff further argues that the ALJ recognized at the hearing that there were no medical records from an acceptable medical source in the file related to plaintiff's

mental impairments or abilities. However, this argument misconstrues the hearing testimony. In fact, the ALJ does not state or imply that there were no acceptable medical records in the file related to plaintiff's mental impairments or abilities. Furthermore, the Court finds that the ALJ provided sufficient reasoning for the decision to discount Dr. Guiling's opinion. The opinion reflects that the ALJ correctly considered several of the statutory factors enumerated in 20 C.F.R. § 404.1527(c) to determine the weight to be accorded to Dr. Guiling's opinion. The ALJ noted that Dr. Guiling examined plaintiff only once and that his opinion appeared to be based on the plaintiff's complaints during the evaluation—— complaints that the ALJ determined were inconsistent with plaintiff's statements in his application materials, to various treating sources, and at his hearing. The ALJ further noted that plaintiff had not demonstrated significant deficiencies in memory, concentration, or cognitive skills to other examiners and had not reported limitations in those areas. The ALJ stated that plaintiff had not alleged deficits in social function and, beyond the third-party statements and Dr. Guiling's report, the record did not support the limitation. "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir.2007) (citing *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir.2001)). Here, the record contained medical records from the Audiology Center stating that plaintiff had good speech discrimination with use of his hearing aids and records from Miracle Ear stating that he should be able to complete tasks when instructed by coworkers and supervisors when he wears his

hearing aids.  Further, plaintiff's graduation from high school in a regular classroom setting and his hobbies of video games, reading, and story-writing were inconsistent with the need for sheltered workshop or a heavily supervised position. Here, the record supports the ALJ's contention as plaintiff testified, on numerous occasions, regarding his ability to do all of the aforementioned activities.

Plaintiff also argues that the other evidence of record was consistent with Dr. Guiling's opinion.   In support of this argument, plaintiff cites the psychological assessment done at Tender Hearts, the statement provided by plaintiff's high school psychological examiner, as well as statements provided by plaintiff's grandmother, aunt, high school teacher, and neighbor.   Each of these statements described plaintiff as immature and lacking in social skills.  The ALJ noted that he considered the third-party evidence submitted and provided a number of reasons why he did not assign any of them great weight, including inconsistency with the evidence and lack of special education.    Upon review of the record, the Court finds that the aforementioned determination is supported by the Disability Determination Explanation (Tr. 73), the Disability Report (Tr. 187-188), the Function Report (Tr. 189-195), the Audiology Center (Tr. 251-256), and Dr. Jung's (Tr. 262) medical reports.   Contrary to plaintiff's argument, the ALJ's determination to assign Dr. Guiling's opinion no weight is supported by substantial medical evidence.

### C.  Residual Functional Capacity

Plaintiff next argues that even if the ALJ was correct in giving no weight to Dr. Guiling's opinion, the ALJ's RFC determination still lacks a sufficient basis.  A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue,* 641 F.3d 909, 923 (8th Cir.2011) (internal

quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.* Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir.2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir.2010); *Eichelberger,* 390 F.3d at 591; *Hutsell v. Massanari,* 259 F.3d 707, 711–12 (8th Cir.2001). As such, the ALJ must "consider at least some supporting evidence from a [medical professional]" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. *Hutsell,* 259 F.3d at 712.

Plaintiff argues that by discounting the opinion of Dr. Guiling, it is unclear what medical evidence the ALJ relied on in assessing the RFC. Plaintiff further argues that while there is some evidence of his impairments, other than Dr. Guiling's opinion, the record does not contain any medical evidence or other evidence to support the ALJ's decision. However, the Court finds that the medical records of the Audiology Center and Dr. Jung provide sufficient support for the ALJ's determination.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and

prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). The ALJ considered medical evidence from physicians and other acceptable medical sources in determining plaintiff's RFC. The ALJ's opinion cites the medical evidence in the record concerning the plaintiff's hearing impairment and notes the lack of evidence regarding his claimed mental impairments. The ALJ concluded that the plaintiff had a sensori-neural impairment of hearing with moderate severity and further noted that the medical records indicate that plaintiff had relatively good speech discrimination and that his only accommodations at school would be sitting in the front of the classroom and FM amplification when available. Those conclusions are both supported by substantial evidence in the record. After reviewing the medical records, the ALJ determined that plaintiff had significant hearing loss, but was able to function at essentially a normal level with his hearing aids.

Furthermore, the Eighth Circuit has held that an ALJ should assess the entire record, including medical reports and the individual's own description of his limitations, in determining the RFC. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir.2000). Here, the ALJ found that plaintiff's allegations of disability lacked credibility for a number of reasons: the absence of objective medical evidence supporting plaintiff's claims, his treatment history, his daily living, and a number of inconsistencies between plaintiff's statements and the record. The ALJ pointed to plaintiff's medical records which indicated that his hearing disorder allowed for relatively good speech discrimination, required only modest accommodations and stated that plaintiff should be able to function at essentially a normal level. Plaintiff did not require special education services during school, did not receive psychiatric

treatment, and stopped attending counseling sessions because he did not feel that he needed therapy. The ALJ also noted inconsistencies between plaintiff's daily activities of reading, writing, and playing video games and his allegations of disabling symptoms. Plaintiff indicated that he had no issues with personal care, completed household chores, could cook, drive a car, shop in stores, manage his own finances, follow written instructions, and had no problem concentrating, remembering or understanding. The Eighth Circuit has found that the ability to perform household chores, handle money, and engage in social activities can undermine an assertion of disability. *See, e.g., Ponder v. Colvin*, 770 F.3d 1190, 1196 (8th Cir. 2014) (holding that substantial evidence supported ALJ's denial of disability benefits in part because claimant's activity level undermined her assertion of total disability when she performed light housework, washed dishes, cooked for her family, did laundry, handled money and paid bills, shopped for groceries and clothing, watched television, drove a vehicle, left her house alone, regularly attended church, and visited her family); *Roberson v. Astrue,* 481 F.3d 1020, 1025 (8th Cir.2007) (holding that substantial evidence supported ALJ's denial of disability benefits in part because claimant "engaged in extensive daily activities," including taking care of her child, driving a vehicle, preparing meals, performing housework, shopping for groceries, handling money, and visiting family). The ALJ properly evaluated the medical evidence and plaintiff's credibility in determining plaintiff's limitations in the RFC.

*   *   *   *   *

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed.**

A judgment in accordance with this Memorandum and Order will be entered separately.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 6th day of July, 2017.